AMCO ELECTRIC, a Corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Amco Electric v. Commissioner
Docket No. 3349-71
United States Tax Court
T.C. Memo 1974-194; 1974 Tax Ct. Memo LEXIS 127; 33 T.C.M. (CCH) 835; T.C.M. (RIA) 74194; July 29, 1974, Filed. Charles E. Millikan, Jr., for the petitioner. Richard H. Gannon and David Roth, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income tax for its fiscal years ended April 30, 1964, 1965, and 1968 in the amounts of $497,061.94, $17,430.73, and $7.26, respectively. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision whether petitioner properly deducted as an accrued expense in its fiscal year ended April 30, 1968, an amount of additional California use tax relating to sales in prior years. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Amco Electric (hereinafter petitioner), a California corporation, *129 had its principal office in Altadena, California when its petition in this case was filed. It filed its Federal corporate income tax returns for the years here in issue on an accrual basis and completed contract method of accounting. Petitioner conducts an electrical contracting business, and during the years here in issue most of its work was either for the Federal Government or for contractors for the Federal Government. Since some of the materials purchased by petitioner were used by it in performance of its contracts in such a manner as to be considered under California law as sales to the Federal Government not subject to sales tax, petitioner had, in 1959, obtained a resale permit and paid California use tax on only those items used in construction on or to real property in the performance of its contracts with the United States. [2] From 1959 until 1965 petitioner analyzed each purchase it made to determine which items would be used by it on machinery and equipment in its Federal Government contracts and so be exempt from the California sale and use tax, and which items would be used in construction on or to real property and therefore be taxable. *130 After a 1965 audit by the California Board of Equalization, petitioner at its request changed the method by which it determined the amount of use tax to be reported on its quarterly use tax returns. Petitioner began reporting the tax on the basis of a percentage computed by estimating the amount of purchases for each job which would be taxable and comparing that amount with the total cost of all supplies used on the particular job. The estimate was made at the outset of every job by a project estimator who examined the blueprints and determined how many of the supplies purchased would be used for improvement to realty (taxable) and how many supplies were to be used on machinery and equipment (nontaxable). The percentage computed was applied to all purchases made each quarter and the use tax liability was based on that dollar amount. During late 1967 auditors from the Board of Equalization began a field audit of petitioner's use tax returns, examining its sales and purchase records for the quarterly periods July 1, 1964 through December 31, 1967. In filing its quarterly tax returns with the Board of Equalization petitioner had not included in taxable sales the prices of certain *131 machinery, electrical equipment and electrical transmission lines, which were sold and furnished to the United States Government and installed by petitioner, in that it was petitioner's position that these sales were not subject to the California sales and use tax. [3]
During the audit procedures, representatives of petitioner discussed with agents of the Board of Equalization each of the transactions being audited.Soon after commencing the audit, the State auditor determined that the figures reported by petitioner on the quarterly returns were unacceptable for two reasons, namely, (1) the estimates of taxable purchases were unsubstantiated in large part, and (2) petitioner's interpretation of what was equipment differed from that of the Board of Equalization. Petitioner's representatives offered to produce substantiation of their estimates from blueprints and other records to the extent the documents were available and maintained that their interpretation of what was equipment *132 and what was used in construction of real property was correct. Petitioner's representatives, in an attempt to illustrate the correctness of their position took representatives of the State Board of Equalization, including the auditor assigned to audit its returns to Vandenberg Air Force Base where petitioner had performed numerous Government contracts. This visit gave the auditors and tax counsel for the State Board an opportunity to assess firsthand the type of work performed and the manner in which some of the items purchased by petitioner were used. On January 26, 1968, following this trip, tax counsel for the State Board of Equalization wrote a memorandum to the Board's auditing division setting forth guidelines as to the taxability of various items to be followed in completion of the audit and supplied a copy of the memorandum to petitioner. These guidelines were in detail. For example, the following opinion was given as to the taxable and nontaxable items at the Launch Control Center: Machinery and equipment includes the cable, package control units, generator unit and package switch gear, all of which are used directly in connection with the wiring or control of the *133 missiles. The space lighting and heating constitute improvements to realty and are taxable to the installing contractor at cost. This would include the small space heater in the ceiling of the control center and the wire, conduit and fixtures which are installed to provide lighting for the room. This would not include lighting directly mounted on the control instrument panels, etc. An equally detailed opinion of taxable and nontaxable items was given as to the Missile Silo, Atlas Missile Site, Titan III, Moon Orbital Laboratory, and Test Stand. In completing the work at petitioner's office pursuant to these guidelines, the auditor prepared working papers which were furnished to petitioner in February of March of 1968. The working papers which were examined by petitioner's accountant contained the percentages at each project reported taxable by petitioners and different percentages proposed by the State auditor. In instances where petitioner was unable to locate the blueprints used at the job or other documents to substantiate the use of the various items purchased for the job, the auditor would, if the purchase was for a job which included taxable items, consider the purchase *134 to be 100 percent taxable because of lack of substantiation to the contrary. After receipt of the auditor's papers, petitioner continued its efforts to locate substantiating documents to show that certain items considered in the auditor's papers as 100 percent taxable in fact were not taxable to that extent and to show other items considered partially taxable by the auditor to be non-taxable. Petitioner's accountant determined that, based on the State auditor's percentages, California sales and use tax on sales during the period July 1, 1964 through December 31, 1967, which had been reported on petitioner's returns as nontaxable, but were considered by the auditor to be taxable, amounted to $106,475.64. Of this amount, $104,348.28 was attributed by petitioner's accountant to contracts he regarded as completed. Petitioner accrued the $104,348.28 as liability on its books and deducted it from its gross income on its corporate tax return for its fiscal year ending April 30, 1968. At this time, representatives of petitioner were still attempting to furnish the auditor of the Board of Equalization with substantiation for items it considered to be nontaxable which the auditor had *135 included as taxable because of lack of substantiation. Petitioner continued to discuss substantiation with the auditor and at no time expressed agreement with the percentages he determined. As of April 30, 1968, petitioner had not paid the $104,348.28, or any part thereof, or filed amended sales tax returns in which this deficiency was reported, or expressly or impliedly admitted the tax liability. Petitioner could have prepaid the additional tax as tentatively proposed by the auditor in whole or in part. Although it was not common practice for taxpayers to pay an additional sales or use tax as proposed by an auditor prior to receipt of the notice of deficiency from the State Board of Equalization, such prepayment was permissible and this was occasionally done by taxpayers to stop the running of interest. Petitioner was unwilling to pay any additional tax until certain issues as to whether certain construction, such as on transmission lines to substations on which there had been a change in position by the Board of Equalization, was finally resolved. In the months following April 30, 1968, at conferences held between petitioner's representatives and agents of the State Board *136 of Equalization, petitioner produced some additional substantiation of the nontaxability of certain transactions, and the agents of the Board of Equlization decided that some of the sales determined by the auditor in his working papers to be taxable were not taxable or were taxable at lower prices than used by the auditor. In September 1968 petitioner was furnished by the auditor with a revised set of workpapers reducing the proposed taxable sales because of now having substantiation which he previously lacked. On October 17, 1968, the State Board of Equalization gave formal notice of determination to petitioner in which a deficiency in tax of $86,610.98 and interest of $12,722.24 were asserted. [4] About the time of the issuance of the notice of determination, petitioner's president conferred with a sales tax specialist whom he had known for some years and with whom he had previously discussed sales tax problems. This agent told petitioner's president that he knew of other contractors who were "getting ex-tax" installations "in the area of concrete and conduit underground" whereas it had been held taxable to petitioner. He also said that several cases were pending before various *137 courts in California regarding legal questions respecting sales and use taxes assessed with respect to items furnished in connection with Federal Government contracts. Petitioner decided to petition for a redetermination of the deficiency determination by the Board, and the sales tax specialist as its agent, filed a petition with the Board for a redetermination within 30 days after October 17, 1968. [5] Following the filing by petitioner for redetermination and a hearing thereon, the Board directed a reaudit of petitioner's liability. Changes were recommended, but at the time of the trial of this case the reaudit was not completed and had been suspended pending the outcome of certain cases pending in the California courts. *138 Petitioner has carried the $104,348.28 amount as an accrued liability on its books and reported it as such in its statements of financial condition since April 30, 1968. Petitioner claimed a deduction on its Federal income tax return for its fiscal year 1968 for accrued sales and use taxes in the sum of $104,348.28, which was disallowed by respondent on the basis that the liability was not properly accrued since it had not been established that "as of the end of your taxable year all events had occured [sic ] to determine the fact of said liabilities or that the amount of any liability could then be fixed with reasonable accuracy." ULTIMATE FINDING OF FACT Petitioner as of April 30, 1968, was contesting any proposed deficiency in its sales or use tax liability for its fiscal years 1965 through 1967. OPINION Section 461(a), I.R.C. 1954, [6] requires that deductions shall be taken by a taxpayer for the taxable year which is proper under that taxpayer's method of accounting. Petitioner used an accrual method of accounting. Section 1.461-1(a) (2), Income Tax Regs., provides that under an accrual method of accounting, "an expense is deductible for the taxable year in which *139 all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." It has long been settled that an accrual basis taxpayer should decudt taxes for the taxable year in which "all the events" have occurred to fix the amount and the fact of the liability although the liability has not been paid. United States v. Anderson, 269 U.S. 422, 441 (1926). For this reason the Court in the Anderson case held that the munitions tax there involved was deductible by the accrual basis taxpayer for the year to which it applied even though the amount was not due and payable until the subsequent year. In the Anderson case there was never a contest of the tax liability. In Dixie Pine Products Co. v. Commissioner, 320 U.S. 516 (1943), the Supreme Court held that a liability for a tax is contingent and not deductible by the taxpayer where the taxpayer is "strenuously contesting the liability in the courts," stating that under these circumstances the taxpayer could not take the deduction "on the theory that the state's exaction constituted *140 a fixed and certain liability" but must "await the event of the state court litigation" and "claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated." This holding was reiterated by the Supreme Court in Security Flour Mills Co. v. Commissioner, 321 U.S. 281 (1944), in which the Supreme Court stated: It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies, and payment whereof he is contesting. * * * Since the decisions of the Supreme Court in Dixie Pine Products Co. and Security Flour Mills Co., there have been many cases involving the issue of whether an accrual basis taxpayer was in fact contesting a tax liability. In Great Island Holding Corporation, 5 T.C. 150 (1945), we held that the "contested tax" rule as stated in Dixie Pine Products Co. was not limited to cases where the dispute had been carried to the court but also applied where a taxpayer had not accrued the items on its books and denied its liability therefor. In *141 that case the taxpayer was affirmatively denying its liability and even filed its tax returns under protest. In Dravo Corporation v. United States, 348 F.2d 542 (Ct. Cls., 1965), it was held that the mere filing of a return showing a liability in a stated amount is not the equivalent of a denial by the taxpayer that he owes a greater amount and that without more than the mere fact of a tax in addition to that shown on the return being due, there is no contest of the liability. [7]
*142 Where the facts of a particular case show more than merely that the tax proposed to be asserted is an amount in excess of that reported by the taxpayer on his return but less than is actually being litigated in court, it is necessary to determine whether the taxpayer is contesting the additional liability to such a point that it may be said in the words of Security Flour Mills Co. v. Commissioner, supra, that the liability is one "which the taxpayer denies, and payment whereof he is contesting." In the instant case it is clear that petitioner had not admitted liability for any additional California sales or use tax for its fiscal years 1964 through 1967 as of the close of its fiscal year 1968 on April 30, 1968. It is also clear that as of April 30, 1968, petitioner was actively attempting to substantiate that items which the State tax auditor had held to be taxable because of lack of substantiation that they were not, were in fact items of equipment sold to the United States Government and therefore nontaxable. The issue here is whether these facts plus the other facts of record in this case and the proper inferences to be drawn therefrom are sufficient for us to *143 conclude that petitioner was denying liability for the additional sales and use tax and contesting its payment. In General Communication Co., 33 T.C. 640, 654 (1960), we held on the facts there present that where a taxpayer as of the close of its taxable year had not admitted a liability nor entered into negotiations for a settlement, it had not carried its burden of proving that the liability was in fact uncontested. We pointed out that while the presence of an admission, expressed or implied, of the liability would serve as proof that a taxpayer was not contesting that liability; and while the absence of such an admission was not conclusive proof of a contest, a gap was left in petitioner's proof where no such admission had been made, pointing out that "A taxpayer may resist payment of an asserted claim in more subtle ways than express denial of liability or adoption of a litigious attitude." We further pointed out that on the facts there present there was a strong indication that the taxpayer intended to resist payment and if necessary to defend against any suit seeking payment. The facts in the instant case in our view likewise strongly indicate that petitioner *144 was resisting payment of any additional tax throughout the end of its fiscal year 1968 as well as thereafter, and that petitioner had no intention of ceasing to resist payment. As of April 30, 1968, petitioner was actively protesting the items determined against it based on lack of substantiation. In concluding that petitioner, from before April 30, 1968, throughout the balance of the year 1968, and in fact up to the time of the trial of this case, was actively contesting any additional sales tax liability, we have considered the testimony of petitioner's president which petitioner contends supports a contrary conclusion. The testimony which petitioner's counsel stresses are the statements of petitioner's president (1) that in February or March of 1968 when he was furnished with the first set of workpapers by the auditor he did not agree or disagree with them and that petitioner was "re-evaluating" those workpapers and comparing them with its tax returns, and (2) that at the time in September of 1968 when he was furnished with the second set of workpapers he "had nothing to disagree with" but that it was when the sales tax specialist came "into the picture that we did make our *145 protest." In our view this testimony of petitioner's president does not call for a conclusion that petitioner was not continuously contesting any additional sales tax liability for its fiscal years 1964 through 1967. Regardless of the initial reaction of petitioner's representatiives to the first set of workpapers furnished to them by the auditor, petitioner did, beginning prior to April 30, 1968 and continuing until September of that year, contest the percentages used by the auditor. Petitioner received the second set of workpapers shortly before receipt of the notice of deficiency from the Board of Equalization. In spite of petitioner's continuous contest of the amounts determined by the auditor, petitioner then knew that the Board was going to assert a substantial additional tax against it. There was no requirement that the additional tax be paid until petitioner had been sent a notice that a deficiency had been determined by the Board of Equalization and 30 days had expired without petitioner's filing a petition for redetermination. Under the procedure in the State of California, there was no way in which petitioner could make a formal "protest" or file a "protest" against *146 the deficiency in the sales or use tax until after it had received a formal notice of deficiency from the Board of Equalization. As soon as petitioner was in a position to file such a formal "protest," it did so continuing in this manner its contest and resistance of payment of any additional sales or use tax, which contest had been going on since the auditor first came to examine petitioner's books in late 1967. The testimony of petitioner's president shows not only that he was knowledgeable as to the sales and use tax problems of companies doing work for the Federal Government but also that he had for years been having what he considered "problems" with the State tax authorities and was hopeful of getting his "problems" finally resolved. Considering all of the evidence in this case, we conclude not only that petitioner, as it admits, had not accepted the additional tax determination as of April 30, 1968, but also conclude that petitioner as of that date was actively contesting a determination of additional sales or use tax for prior years. There was no reason for petitioner to decide whether to file a formal "protest" which is the terminology used by petitioner's president *147 to refer to filing a petition for redetermination of the deficiency asserted by the Board of Equalization until it had received the notice of deficiency from the Board and was in a position to file such a formal "protest." It might have been that petitioner's contest of any deficiency with the agents of the Board would have been successful and no deficiencies, or a very small deficiency, would have been determined by the Board and there would have been no reason for a formal "protest." Petitioner relies primarily on Lutz v. Commissioner, 396 F.2d 412 (C.A. 9, 1968), reversing 45 T.C. 615 (1966). Since an appeal in the instant case would lie to the Ninth Circuit, if we agreed with petitioner that Lutz v. Commissioner, supra, was not distinguishable from the instant case, we would, under our holding in Jack E. Golsen, 54 T.C. 742 (1970), aff'd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1970), have to follow the holding of the Ninth Circuit in that case. However, in our view, the facts in the Lutz case are clearly distinguishable from those in the instant case. The taxpayers in the Lutz *148 case were members of a partnership which had constructed certain houses in the State of Washington under contracts awarded to them under the Capehart Act of 1955 (42 U.S.C. section 1594). Since under the Capehart Act, the stock of the corporation owning the housing facilities is owned by the Department of Defense, some question existed as to whether the Washington tax on the sale of such structures was lawfully imposed. Several other contractors constructing houses under the Capehart Act in the State of Washington contested the Washington State tax by suit in a State court, but the partnership made no such contest of its tax. The State of Washington notified the partnership that collection of the tax was being held in abeyance pending determination of the litigation in other suits although it was still required to file a return, and this same procedure was later extended to all persons constructing houses under the Capehart Act. The Ninth Ciruit pointed out that this Court had found it unnecessary to decide whether the partnership was "contesting" its liability because whether or not the liability was being contested, the "all events" test had not been satisfied. *149 The Ninth Circuit then stated that it rejected that premise as it applied to the facts of that case, since it knew of no authority "for the proposition that a third party's contest of liability makes a taxpayer's similar liability contingent." That court then pointed out that even though, if the contest by other parties was successful, the taxpayer might avoid liability, such a possibility was too remote to describe the liability as contingent. The court relied strongly on the Court of Claims' decision in Dravo Corporation v. United States, supra, which held that the mere fact that the proposed tax was a deficiency which had not been reported as tax on a return did not constitute a contest. That court quoted at length from that case and equated the situation in the Lutz case to that in the Dravo case. The contest between the contractors and the State of Washington in the Lutz case was whether any tax was due on work done on houses for a corporation set up under the Capehart Act. This factor was identical to all contractors working on such houses and was strictly a qustion of law. If the State chose not to collect tax from any such contractors and this action by the *150 State was considered a contest, then there was no effective manner in which a taxpayer could avoid a contest. In the instant case, petitioner's tax liability rested on facts which were to a large extent not applicable to all contractors doing defense work. However, an even more important fact which is present in the instant case that was absent in the Lutz case is that petitioner was not a mere bystander awaiting the outcome of litigation by others. Petitioner, from the time of the arrival of the State auditor on its premises, contended that it did not owe additional tax, basing that contention on two grounds, one totally factual as to substantiation, and the other a mixed factual and legal question of what was real property and what was equipment. It would obviously have been a futile gesture for petitioner to have further protested the legal proposition of what items were equipment with an auditor who had been directed by the tax counsel for his employer, the Board of Equalization, as to the proper legal interpretation. Had petitioner proposed to accept the Board's interpretation, its representatives might well have so stated to the auditor but no such statement was made. At *151 the appropriate time petitioner in an appropriate manner contested the interpretation placed by the Board on equipment as compared to real property. Petitioner states that we cannot look past April 30, 1968, and therefore cannot consider its active protest in the fall of 1968. In reaching our conclusion we have not considered facts after April 30, 1968, except to the extent they corroborate the conclusion from other evidence in the record which we set forth in our Ultimate Finding of Fact that petitioner was throughout the period from late 1967 when the auditor came to audit his sales and use tax returns to the time of the trial of this case, contesting in every appropriate manner any proposed deficiency in its sales and use tax. Therefore, in our view, Lutz v. Commissioner, supra, is completely distinguishable on its facts and not only does not require a conclusion favorable to petitioner but in fact does not even support petitioner's position in the instant case. Here petitioner was actively contesting its liability for the additional tax, whereas in the Lutz case the Ninth Circuit concluded the taxpayer was not contesting its tax liability. We hold that respondent *152 properly disallowed petitioner's claimed deduction for its fiscal year ended April 30, 1968, of $104,348.28 of California sales and use tax. Decision will be entered under Rule 155. Footnotes
1. Since petitioner has claimed a loss carryback from its fiscal year 1968, this issue also affects prior years. ↩
2. Cal. Rev. & Tax. Code, sec. 6051 (West Ann., 1954), imposes a sales tax, sec. 6201 imposes a use tax, and secs. 6242 and 6243 provide for issuance of a resale certificate relieving persons under certain specified conditions from collecting the sales tax from its customers. Sec. 6352 provides an exception from the sale and use tax of property "exempted by constitution or federal law" which includes sales to the Federal Government. Sec. 6384 provides as follows: Notwithstanding any other provision of law the tax imposed under this part shall apply to the gross receipts from the sale of any tangible personal property to contractors purchasing such property either as the agents of the United States or for their own account and subsequent resale to the United States for use in the performance of contracts with the United States for the construction of improvements on or to real property in this State. ↩
3. Cal. Rev. & Tax Code, sec. 6452↩ (West Ann., 1954), provides for the filing of quarterly sales and use tax returns by every seller or retailer engaged in business in the State. 4. Cal. Rev. & Tax. Code, secs. 6481, 6486, 6561, 6561.5, 6562, 6564, and 6565 (West Ann., 1954), provides: Sec. 6481. Computation by board; determination for discontinued business If the board is not satisfied with the return or returns of the tax or the amount of tax required to be paid to the State by any person, it may compute and determine the amount required to be paid upon the basis of the facts contained in the return or returns or upon the basis of any information within its possession or that may come into its possession. One or more deficiency determinations may be made of the amount due for one or for more than one period. When a business is discontinued a determination may be made at any time thereafter, within the periods specified in Section 6487, as to liability arising out of that business, irrespective of whether the determination is issued prior to the due date of the liability as otherwise specified in this part. Sec. 6486. Notice of determination; service The board shall give to the retailer or person storing, using, or consuming tangible personal property written notice of its determination. The notice may be served personally or by mail; if by mail, service shall be made pursuant to Section 1013 of the Code of Civil Procedure and shall be addressed to the retailer or person storing, using, or consuming tangible personal property at his address as it appears in the records of the board, but the service shall be deemed complete at the time of the deposit of the notice in the mail without extension of time for any reason. Sec. 6561. Petition; time; finality of determination upon failure to file Any person against whom a determination is made under Articles 2 or 3 of this chapter or any person directly interested may petition for a redetermination within 30 days after service upon the person of notice thereof. If a petition for redetermination is not filed within the 30-day period, the determination becomes final at the expiration of the period. Sec. 6561.5 Form of petition; amendment Every petition for redetermination shall be in writing and shall state the specific grounds upon which the petition is founded. The petition may be amended to state additional grounds at any time prior to the date on which the board issues its order or decision upon the petition for redetermination. Sec. 6562. Reconsideration; hearing; notice; continuances If a petition for redetermination is filed within the 30-day period, the board shall reconsider the determination and, if the person has so requested in his petition, shall grant the person an oral hearing and shall give him 10 days' notice of the time and place of the hearing. The board may continue the hearing from time to time as may be necessary. Sec. 6564. Finality of redetermination The order or decision of the board upon a petition for redetermination becomes final 30 days after service upon the petitioner of notice thereof. Sec. 6565. Due dates; delinquency penalties All determinations made by the board under Articles 2 or 3 of this chapter are due and payable at the time they become final. If they are not paid when due and payable, a penalty of 10 per cent of the amount of the determination, exclusive of interest and penalties, shall be added thereto. ↩
5. The California statutes permit suits in the State courts with respect to the legality of a sale or use tax assessment only after payment of the tax and filing of a claim for refund and disallowance of that claim. Cal. Rev. & Tax. Code, secs. 6932 and 6933 (West Ann., 1954), provides Sec. 6932. Claim for refund or credit; necessity No suit or proceeding shall be maintained in any court for the recovery of any amount alleged to have been erroneously or illegally determined or collected unless a claim for refund or credit has been duly filed pursuant to Article 1 of this chapter. [Footnote omitted.] Sec. 6933. Statute of limitations; jurisdiction; venue; waiver by failure to sue Within 90 days after the mailing of the notice of the board's action upon a claim filed pursuant to Article 1 of this chapter, [Footnote omitted] the claimant may bring an action against the board on the grounds set forth in the claim in a court of competent jurisdiction in any city or city and county of this State in which the Attorney General has an office for the recovery of the whole or any part of the amount with respect to which the claim has been disallowed. Failure to bring action within the time specified constitutes a waiver of any demand against the State on account of alleged overpayments. ↩
6. All references are to the Internal Revenue Code of 1954. ↩
7. Rev. Rul. 68-631, 1968-2 C.B. 198, 199, accepted the holding of the Court of Claims in Dravo Corporation v. United States, 348 F.2d 542↩ (1965) and stated that the Internal Revenue Service would "no longer consider the mere filing of a return as a contest in the absence of some objective act of protest or affirmative evidence of denial of liability by the taxpayer." Respondent in his brief in this case specifically states that he accepts the holding of the Court of Claims in the Dravo case and is not contending that the mere fact that the liability here proposed is an amount in excess of the amount shown by petitioner on its return causes petitioner to be contesting this liability.